IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| LUCINDA MARIE JENKS f/k/a ) <br> LUCINDA MARIE PETERSON, ) <br> Personal Representative for the Estate of, ) <br> DORINE OLSON, ) <br> Plaintiff, ) <br>  ) <br> v. ) <br>  ) <br> NAPLES COMMUNITY HOSPITAL, INC., ) <br> NCH HEALTHCARE SYSTEM, INC., ) <br> Defendants ) <br> _____ ) | Civil Action No. 2:10-cv-00197-CEH-DNF |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, LUCINDA MARIE JENKS, f/k/a LUCINDA MARIE PETERSON, personal representative for the Estate of DORINE OLSON, by and through her respective attorney, and in response to Defendants' Motion for Summary Judgment files her reply[1].

**STATEMENT OF FACTS**

Decedent, Dorine Olson (hereinafter "Mrs. Olson"), began employment with Defendants on or about August 20, 1990 and, except for time off due to maternity from 1996 through 1997, maintained her employment with Defendants until her death on June 12, 2010 (Exh. A - Thigpen dec. ¶¶ 4,7). Mrs. Olson was diagnosed with breast cancer approximately January 20, 2009 and therefore applied for coverage under the Family Medical Leave Act ("FMLA") on February 2, 2009 (29 U.S.C.S. §2615) (Exh. B - FMLA certifications). Mrs. Olson's coverage was approved on February 4, 2009 and she remained covered until her death (Exh. B; Exh. A. ¶ 7).

Although Mrs. Olson began her administrative medical career with Defendants as a secretary, she successfully transitioned through other administrative posts (Exh. C, Olson's department transfers; Exh. A ¶¶ 4, 5) While employed by Defendants, Mrs. Olson received several promotions,

---

[1] Defendant's Summary Judgment Motion certifies that her Motion was filed May 18, **2010**; however, according to the Federal Court Docket, the Motion was filed May 18, **2011** (Doc. No. 41).

commendations and excellent employee reviews including several Key Contributor nominations, which were described by Renee Thigpen, Defendants' Human Resources Director, as "an opportunity to recognize an employee who has demonstrated varying things throughout the years such as exceeds in their performance review, good attendance,...participating in committees, or things in the community." (Exh. D – Olson's evaluations; Exh. E – Thigpen Depo. 26:24–25, 27:1-3). According to Thigpen, Mrs. Olson's 2007 and 2008 evaluations reflect an employee "excelling" in her job (Exh. D; Exh. E 28:22).

On or about January 2009, Barry Hawthorne became the Interim Director of The Nurse's Registry "TNR" and at that time Mrs. Olson was the staffing assistant within that department (Exh. E 31:7–11, 23:8 – 11). As part of Hawthorne's restructuring of the TNR position, he promoted Mrs. Olson to the newly created salaried position of TNR coordinator (Exh. F - Hawthorne dec. ¶ 4). According to Hawthorne, Linda Gipson, who at that time was Mr. Hawthorne's supervisor and the Chief Nursing Officer, was reluctant to place Mrs. Olson in the position, but Hawthorne was certain Mrs. Olson could perform the duties of the position and championed her placement (Exh. F ¶¶ 2, 3, 4).

Mrs. Olson assumed her new position in March 2009, which as a newly transferred employee had an initial 90 day probationary period (Exh. F ¶ 5). On April 13, 2009, Mrs. Olson had a right breast mastectomy and her ovaries removed, but returned to work on May 4, 2009 and satisfactorily completed the basic skills of her new position within her initial probationary period (Exh. G - Journal of Dorine Olson at OLSON-000003 - 000004; Exhibit H - Employee Introductory Review and/or Extension of Introductory Period ("Extension"). Furthermore, according to H.R. Director, Renee Thigpen's testimony, the information provided on the Extension form, verifies that Mrs. Olson "exhibited satisfactory progress and met the requirements in the performance of [her] job description, accountabilities, and standards of behavior" (Exh. E 38:20–24). Nevertheless, Mrs. Olson's probation was continued an additional sixty days in order to improve certain "deficiencies" (Exh. F ¶ 8). At Hawthorne's and Mrs. Olson's June 2009 meeting, he outlined five goals for her to achieve during her sixty day extension (Exhibit H). On the Extension form, Mr. Hawthorne stated that Mrs. Olson had "...grown and shown improved performance, the true impact of this role is just now solidifying...learning well from each case." (Ex. H) [2] Mr. Hawthorne described the then upcoming sixty day extension as a time for Mrs. Olson to "solidify her performance and on-going success" (*Id.*).

---

[2] Mr. Hawthorne interpreted his handwriting on the Extension of Introductory Period form within his declaration on pages 3 and 4, ¶ 8 (Exh. F) .

2

While Mrs. Olson performed the job of TNR coordinator she continued to receive treatment for cancer; however, she scheduled her medical appointments before 8:00 A.M. or after 3:00 P.M. according to the needs of her employer (Exh. I - Lynn Lafamina depo. 24:17-23). According to Louis Lafamina ("Louis"), Mrs. Olson's friend and colleague, who provided her transportation to her doctor's appointments, Mrs. Olson would return to work after her late afternoon medical appointments and work "late" because she was "dedicated" and "proud" of her new position (Exh. J – Louis Lafamina depo 43:16–18)[3]. Furthermore, according to Lynn Lafamina ("Lynn"), Mrs. Olson's longtime friend, Mrs. Olson "never had attendance issues" during her entire employment with the Defendants (Exh. I 20:18-19). Contrary to a document signed by Melody Bacon, R.N., Mrs. Olson was unaware of unaccounted for periods of time that were interfering with her job performance (Exh. I 44:13-24; Exh. K - "Requested/Not Completed"). However, fatigue was a side effect that Mrs. Olson occasionally experienced due to her cancer (Exh. L - Lucinda Jenks depo. 14:21). Mrs. Olson's treating physician, Joel Grossman, M.D. indicated on her initial FMLA documents that Mrs. Olson would experience periodic "episodic flare-ups" (Exh. B at NCH 0405). Therefore, a need for additional break periods were a reasonable accommodation due to her handicap.

On July 31, 2009, Hawthorne's contract with the Defendants concluded and he was replaced by Melody Bacon, a registered nurse, thereby making her Mrs. Olson's immediate supervisor (Exh. F. ¶¶ 9, 10). During her sixty day extended probationary period, Mrs. Olson completed all of the goals initially established by Hawthorne (Exh. G at OLSON-000004). Following Hawthorne's departure, Mrs. Olson spoke numerous times with Linda Gipson and Melody Bacon regarding her progress and was repeatedly told that she was doing "fine" and "not to worry" (id.) Although Gipson and Bacon had repeatedly told Mrs. Olson that her performance was "fine", at the conclusion of her extended probationary period, unbeknownst to Mrs. Olson, Bacon met with Gipson and Thigpen who agreed to remove Mrs. Olson from the TNR coordinator position (Exh. G at OLSON-000004; Exh. M – Exh. M. ¶¶ 10, 11). On August 27, 2009, Mrs. Olson met with Gipson and Bacon who informed her that she was not the right "fit" for the position and she was given thirty days to find other employment at the hospital (Exh. I 20:14-15; Exh. N - Charge of Discrimination). Ms. Olson was "flabbergasted" at her sudden termination especially since her managers had failed to give her any warning that her termination was

---

[3] The record consists of deposition testimony from Louis and Lynn Lafamina. Therefore for clarity and to avoid confusion both parties will be referenced by their first names, i.e., "Louis" and "Lynn".

3

imminent (Exh. I 20:13-14). Furthermore, Mrs. Olson never received any written statement outlining the reasons for her termination (Exh. G at OLSON-000004; Exh. I 21:3-7). Mrs. Olson's receipt of Exhibit K, the "Requested Not Completed" list is disputed by the Defendants (Exh. O – Bacon's depo 26: 24–25, 27:5–25; Exh. P - Gipson depo. 34:3-23; Exh. I 39:17-20).

Following her termination from the TNR position, Mrs. Olson applied for and was given the job of unit secretary within the Naples Community Hospital (Exh. A ¶ 14). Her starting salary of this position was less than her salary as a TNR coordinator (Exh. Q – Internal Hire/ Employee Transfer). Ms. Olson remained in her capacity as a full time unit secretary until her sudden death due to cancer in June 2010 (Exh. A ¶ 7).

### Procedural History

On or about September 1, 2009, Mrs. Olson filed initial charges with the Equal Employment Opportunity Commission ("EEOC") charging the Defendants with disability discrimination (Exh. R – EEOC Charge of Discrimination). On November 10, 2009, the EEOC issued a Notice of Right to Sue indicating that although less than 180 days had passed since her filing, they would most likely not complete their investigation in a timely manner and therefore were closing the case (Exh. S - Notice of Right to Sue). On February 8, 2010, Plaintiff filed a Complaint in the Florida state court system against Defendants, seeking relief due to handicap discrimination; intentional infliction of emotional distress; negligent supervision and retention of employee; and, violation of FMLA (Doc. No. 2). Defendants removed the state action to Federal Court due to the FMLA cause of action on March 31, 2010 (Doc. No. 1). Therefore, on May 19, 2010, Plaintiff refiled her Complaint in Federal Court with the following additional claims: violations of ADA and section 504 of the Rehabilitation Act of 1973 (Doc. No. 17)[4]. Defendants moved to deny the additional claims; however, Defendants' Motion was denied by this Court (Doc Nos. 12, 16).

A case management report; discovery and mediation have been completed (Doc. Nos. 19, 22, 34). At this time, the Defendants have filed a Motion for Summary Judgment; however, Plaintiff asserts that the Defendants' Motion for Summary Judgment should be denied because there are numerous genuine issues of material facts related to Plaintiff's employment resulting in discrimination. Therefore, Defendants are not entitled to a judgment as a matter of law.

---

[4] Complaint was later amended following Dorine Olson's death to name the personal representative of the estate as the Plaintiff.

## LEGAL ARGUMENTS

1. **DECEDENT DORINE OLSON'S STATEMENTS ARE ADMISSIBLE AS EXCEPTIONS TO THE FEDERAL HEARSAY RULES.**

Mrs. Olson was diagnosed with stage 4 breast cancer in January 2009, but, continued to lead a full life, including working on a full time basis and caring for her children, until her death in June 2010 (Exh. T - Lynn Lafamina Affidavit ¶¶ 5, 9, 10; Exh. W – Olson's medical records).  Unfortunately, much earlier than anticipated, suddenly Mrs. Olson succumbed to her cancer (Exh. T ¶ 10).  However, prior to her death, the following statements made by Mrs. Olson regarding Defendants' discriminatory behavior towards her while she held the position of TNR coordinator are part of this record and admissible under the Federal Rules of Evidence:

1. Mrs. Olson's journal (Exh. G);
2. Mrs. Olson's EEOC Charge (Exh. R);
3. Statements and actions she made to and before her long time friend, Lynn Lafamina (Exh. I 20:8–23; 22:11–15; 23:17–22; 26:13-25; 27:1-6; 28:3-10; 39:3-25; 40:1-25;).

### a. The journal is admissible evidence

The first issue regarding the journal is whether or not it was actually written by Dorine Olson. Supporting the authenticity that Mrs. Olson was indeed the author of the journal is an attached affidavit by Lynn Lafamina (Exh. T).  Among other statements, Lynn verifies under oath that she had known Dorine Olson for several years and is sufficiently familiar with her handwriting by (1) observing her write; (2) and has seen multiple documents handwritten by Mrs. Olson (Exh. T ¶¶ 3,4).  Therefore, per Fed. R. Evid. 901(b)(2), the journal is admissible evidence.  Additionally as a nonexpert witness, her statements via affidavit and deposition verify that she is (1) *rationally based*; (2) her opinion will be *helpful to the determination* of many facts in this case; and (3) *her opinion is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702* (Fed. R. Evid. 701) (see **Hall v. United Ins. Co. of Am**., 367 F. 3d 1255, 2004 U.S. App. LEXIS 8556 (11th Cir. 2004)).

The next issue regarding the journal is whether or not the statements contained therein will be admissible under the Federal Rules of Evidence hearsay rules.  One of the primary issues of this case is whether or not Mrs. Olson was under a misperception that she was performing her job in a satisfactory manner.  Therefore, contrary to Defendants' assertion, "state of mind" is a very relevant issue in this

case (Fed.R. Evid. 803(3)). Federal Rule of Evidence 401 defines relevant evidence as *evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence*. The last date of the journal is August 27, 2009 and therefore, it is clear that the diary was made after the meeting. The journal reflects Mrs. Olson's "state of mind" at the August 27, 2009 meeting between Mrs. Olson, Linda Gipson and Melody Bacon (Fed.R. Evid. 803(3)). The journal documents what Mrs. Olson understood to be her job duties; how she perceived her job performance at the end of her probationary period; and her feelings during the August 2009 meeting, i.e., that the Defendants had decided that they no longer wanted a "person with cancer" as the TNR coordinator (Exh. G at OLSON-00005). Not only does the journal reflect Mrs. Olson's state of mind, but, it also has probative value of Linda Gipson's and Melody Bacon's state of mind at the time of the meeting. In *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, a fired employee wanted to admit into evidence racially disparaging remarks which he heard from his supervisors. The lower Court found the statements inadmissible as hearsay; however, on appeal this finding was overturned (*Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1250). The appellate Court determined that Talley was not offering the statements of evidence *to prove the truth of the matter asserted*, rather the statements were being offered to demonstrate the attitudes of his supervisors (*Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1250). Therefore, the Court determined that such statements were admissible as hearsay exceptions demonstrating the declarants', i.e., the supervisors', then existing state of mind (*Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1250). The instant case is very similar to *Talley* (*Id*.) According to the journal, during the August 2009 meeting, Linda Gipson stated to Mrs. Olson "**...because you have cancer we have been more lenient and let you get away with more because no one wanted to hurt [your] feelings**" (bold added for emphasis) (Exh. G at OLSON-000006). The statement is not being offered to prove the truth of the matter asserted, but, rather to demonstrate the demeaning state of mind Linda Gipson had developed towards Mrs. Olson because of her cancer. These factors are relevant to Plaintiff's entire law suit including her claim for damages.

Should the Court find that the journal statements are not "state of mind" exceptions, than alternatively, the journal should be admitted under the Residual Exception, Federal Rules of Evidence 807. The following foundation and standards of this rule have been met in order for the Court to allow the journal to be admitted as evidence:

6

- defense is aware of the journal as it was produced by Plaintiff during discovery phase; testimony from witnesses regarding statements within the journal were taken at depositions and thus relate back to the journal; and the Defendants refer to the journal in their Summary Judgment Motion;

- as discussed earlier, the affidavit of Lynn Lafamina authenticates that the journal was handwritten by Dorine Olson (see *Hall v. United Ins. Co. of Am.*, 367 F. 3d 1255, 2004 U.S. App. LEXIS 8556 (11th Cir. 2004) where the Court struck down the Plaintiff's affidavit because the Plaintiff had not demonstrated sufficient familiarity with the proffered party whose handwriting was in question. According to the *Hall* court, a foundation based on Federal Rules of Evidence 701 and 901(b)(2) must be established on the lay person authenticating the document (*Id*.). All such foundation elements have been met with Lynn's affidavit);

- the statements found within the journal are not inconsistent with Plaintiff's witnesses' other statements or her statement found within her EEOC charge (Exh. R);

- the statement is being offered as evidence of several material facts;

- the statements in the journal are more probative on the issues set forth in Plaintiff's claims than any other evidence which the Plaintiff can produce through reasonable efforts;[5]

- Defendant's argument that due to Mrs. Olson's cancer, death was imminent is not supported by the record. Per Lynn's affidavit, in May 2010, Mrs. Olson was doing well, working full time and taking care of her children (Exh. T). Also within weeks of her death, Dr. Grossman reported that Mrs. Olson was doing well and pain free (Exh. W).

- the interest of justice will be well served by the admission of this journal as they paint a clear picture of Plaintiff's issues and concerns in this matter (Fed. R. Evid. 807).

  b. <u>The EEOC Charge</u>

On September 1, 2009, Mrs. Olson filed a charge with the Equal Employment Opportunity Commission detailing how the Defendants had discriminated against her due to her disability (Exh. R). Mrs. Olson signed the Charge under penalty of perjury that her statements were true and correct (Exh.

---

[5] Contrary to Defendants' assertions, Plaintiff was unrepresented by Counsel during the EEOC phase of her investigation. Furthermore, Mrs. Olson died within weeks of Plaintiff's filing of her amended Complaint and therefore, the inference of a substantial time lag is inaccurate.

7

R).  Courts have long considered EEOC charges that are "sworn to" or in the form of a declaration, to be considered for evidence in opposition to a summary judgment, as long as the charge meets the requirements of Fed. R. Civ. Pr. 56 (e) (*Yeomans v. Forster & Howell, Inc.*, 2010 U.S. Dist. LEXIS 94713 (M.D. Ala. Sept. 10, 2010) citing to *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, 526 F. Supp. 2d 746 (S.D. Tex 2007) and *Lumoa v. Poetter*, 351 F. Supp. 2d 426, 432 (M.D. N.C. 2004)).  Therefore, Mrs. Olson's sworn to statements made within her EEOC charge can be considered when ruling on this summary judgment motion.  Furthermore, within Mrs. Olson's charge she states that she completed both of her probationary periods satisfactorily and was unaware of poor job performance, but that her employer was terminating her from the position regardless of her conduct.  These statements reflect genuine issues of material fact and therefore, this Summary Judgment Motion must be denied (Fed. R. Civ. Pr. 56 (a))

    c.    <u>**Statements made to Lynn Lafamina**</u>

Mrs. Olson made several statements to her friend Lynn which can be admitted under several evidentiary rules: Fed. R. Evid. 803 (1), (2), and (3).

- **Present sense impression (Fed. R. Evid. 803(1))**

According to Lynn, she visited with Mrs. Olson shortly after her August 27, 2009 meeting with Gipson and Bacon (Exh. I 40:4-6).  Mrs. Olson's statements to Lynn at that time are her account of what happened at the meeting, as well as, the mental anguish she was experiencing.  Furthermore, they document Mrs. Olson's position that she was unaware that she was performing poorly; received no prior warnings to imply that she was failing her probationary period; and that the sudden termination caused her severe emotional turmoil (Exh. I 20:1–23; 22:11–15; 26:13-25;  27:1–6).  These statements reflect genuine issues of material fact and were made to Lynn by Mrs. Olson on the same day as the meeting and therefore are admissible per Fed. R. Evid. 803 (1) and this Summary Judgment Motion should be denied (Fed. R. Civ. Pr. 56 (a)).

- **Excited utterance; then existing mental, emotional condition (Fed. R. Evid. 803(2)(3))**

Mrs. Olson made statements to Lynn following her August 27, 2009 meeting with her employer while she was still under a "state of excitement" (Fed. R. Evid. 803(2), Note to Paragraph (2)).  Within their explanation of the excited utterance exception, the Rules direct the Court to "...look at the character of the transaction or event...[to] determine the significance of the time factor" (Fed. R. Evid. 803(2), Note

8

to Paragraph (2)). In this case, the record reflects a woman struggling with stage 4 cancer; an excellent prior work history with Defendants; "happy" with her new TNR position and working towards accomplishing the goals that her first supervisor, Barry Hawthorne had set out for her (Exh. D; Exh. L 9:9–21; Ex. G at OLSON-000002; Exh. J 43:9-14; Exh. I 20:1-15). Suddenly on August 27, 2009, she learned that her supervisors had determined she was not a good "fit" for the position and gave her thirty days to find something else or her career with the employer was finished (Exh. I 21:3–15; 44:13-24). According to Lynn, when Mrs. Olson described the events of the meeting she was "flabbergasted" "surprised, to say the least"; "shocked"; cried; and repeated certain statements from the meeting continually (Exh. I 20:13–16; 22:9-15; 27:10-14). These statements were made to Lynn by Mrs. Olson on the same day as the meeting and therefore are admissible per Fed. R. Evid. 803(2) and Fed. R. Evid. 803(3).

2.   **DEFENDANTS' DEMEANING AND CONDESENDING BEHAVIOR TOWARDS DORINE OLSON DUE TO HER DISABILITY DENIED HER THE *SAME OPPORTUNITY TO IMPROVE HER PERFORMANCE* THAT WAS OPEN TO ALL OTHER EMPLOYEES (*VAUGHN V. EDEL*, 918 F.2D 517 (5TH CIR. 1990)). SUCH CONDUCT IS A VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AS AMENDED, 42 U.S.C. § 2000e ET. SEQ and FL STATUTE §7610 ET SEQ. (*VAUGHN V. EDEL*, 918 F.2d 517 (5TH CIR. 1990)).**

During the August 2009 meeting with Linda Gipson, Melody Bacon and Mrs. Olson, after her supervisors told her that she was not the right "fit" for the position, the following exchange occurred:

Mrs. Olson:   *I felt like they promoted the person with cancer and now they are changing their mind.*

Linda Gipson:   *To the contrary, because you have cancer we have been more lenient and let you get away with more because no one wanted to hurt [your] feelings.* (Ex. G at OLSON-000004-000005).

When this exchange was read to Gipson at her deposition, she denied making this statement; however, Bacon's testimony is more supportive of Mrs. Olson's position (Exh. P 35:18-25; 36:1–17; Exh. O 30:4–17). Defendants created a false sense of security with constant reassurance to Mrs. Olson that she was doing "fine" (Exh. G at OLSON-000004).   According to H.R. Director Thigpen, if Mrs. Olson was correct in her assertions and rather than supervising her, Ms. Gipson and Ms. Bacon were patronizing her, then their actions were contrary to the policies and procedures set forth in the NCH Handbook (Exh. E 44:12–25; 45:1-9).   Furthermore, rather than reprimanding Mrs. Olson for

9

inappropriate notice regarding time off requests, although Ms. Bacon recognized the error, she allowed Mrs. Olson to leave "without comment" (Exh. M ¶ 12). In *Vaughn v. Edel*, 918 F.2d 517 (5th Cir. 1990)), when the employer's decision not to reprimand an employee for errors in her performance was racially motivated and this lack of supervision resulted in her termination, the Court determined that the employer's behavior was discriminatory. Like Vaughn, the employer's behavior resulted in Mrs. Olson not being given the same opportunity to learn as the able bodied employees and because the employer's decision was motivated by Mrs. Olson's handicap it was a violation of Title VII (*Vaughn v. Edel*, 918 F.2d 517 (5th Cir. 1990)). Although the Defendants point to a list documenting items Mrs. Olson failed or did not complete during her probationary period, according to Mrs. Olson and Lynn, curiously this list was not given to Mrs. Olson at the August 2009 meeting. Furthermore, the items on the list are inconsistent with Mrs. Olson's statements (Exh I 39:17-20).

- **Regarded as having an impairment**

One of the elements of coverage under the Americans with Disabilities Act ("ADA") is that your employer "regards" you as having an impairment (42 U.S.C. §12101 et. seq. and 29 C.F.R. §1630-2(g)(iii)). According to the ADA, a reflection that an employer regards an employee as having limiting impairments is when the employer treats an employee in a manner that constitutes such a limitation (29 C.F.R. §1602-1). Defendants assert that Plaintiff's claim in this matter is unfounded simply because Mrs. Olson was promoted to the position shortly after her cancer diagnosis was known; however, the Defendants have failed to look at the employers conduct **after** the promotion (bold added for emphasis). The unrequested leniencies solely due to Mrs. Olson's cancer, which resulted in the termination of her position, as well as Ms. Gipson's statements to Mrs. Olson, reflect that her employer regarded her as having an impairment. This evidence presents genuine issues of material fact as to whether or not the employer regarded Mrs. Olson as disabled within the ADA's definition.

Therefore, contrary to Defendants' assertions, a reasonable jury could infer that Defendants 1). discriminated against Mrs. Olson due to her disabilities and 2). regarded Mrs. Olson as suffering from a disabling condition that substantially limited her ability to work and therefore Defendants' Summary Judgment Motion should be dismissed (*Phillips v. Jenny Craig Weight Loss Centres, Inc.*, 1998 U.S. Dist. LEXIS 21590 citing to *Holihan v. Lucky Stores Inc., 87 F. 3d 362, 366-67 (9th Cir. 1996))*.

3.  MRS. OLSON'S REASONABLE ACCOMMODATIONS, IN THE FORM OF ADDITIONAL BREAKS AND MEDICAL APPOINTMENTS RESULTED IN THE LOSS OF HER NEW POSITION.

The Defendants' argument that Mrs. Olson never requested a reasonable accommodation completely disregards her FMLA documentation approved by her employer. Fatigue was a side effect that Mrs. Olson occasionally experienced due to her cancer (Exh. L 9:9-21). Dr. Grossman indicated on Mrs. Olson's FMLA documents that she would experience periodic "episodic flare-ups" (Exh. B at NCH 0405). Therefore, a need for additional break periods would be a reasonable accommodation due to her handicap. Defendants state that one reason they terminated Mrs. Olson was due to long absences away from her desk; however, a genuine issue of material fact exists regarding whether or not the absences were related to her disabilities or other issues.

**4. PLAINTIFF'S ADA CLAIM WAS ADDED AFTER DEFENDANTS REMOVED THE CASE TO FEDERAL COURT; HOWEVER THE ADDITIONAL CAUSES OF ACTION "RELATE BACK" TO THE DATE OF THE ORIGINAL PLEADING (FED. R. CIV. PR. 15 (c)).**

The procedural history of this case demonstrates that Plaintiff originally filed this action in Florida state court; however, the Defendants chose to remove this case to federal court because of the FMLA cause of action. (Doc. No. 1). Due to the new federal court jurisdiction, Plaintiff amended her Complaint on May 19, 2010, to include the following federal causes of action: violation of Title I of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 (Doc. No. 17). Defendants assert that these additional claims are not timely in relation to the Plaintiff's November 10, 2009, Notice of Right To Sue; however, these additional theories of recovery were a direct result of Defendants' request to remove this case to Federal Court. Therefore, under the "relates back" doctrine, the Federal rules would allow this amendment because the additional claims arise out of the "...conduct, transaction, or occurrence set out...in the original pleading" Fed. R. Civ. P. 15 (c). The instant case is similar to the issues in *Molukwu v. City of N.Y.*, 2000 U.S. Dist. LEXIS 10634, *2-4 (S.D.N.Y. 2000)) where the Court allowed the Plaintiff to amend his Complaint when the case was removed to federal court, to add his Title VII and ADA claims, even though it was beyond ninety days from the Right To Sue Notice. Additionally, the above referenced disability claims are within the original jurisdiction of the federal court not state court and therefore, it would have been improper for them to be raised in the original Complaint. 28 U.S.C., §1331 Therefore, not only would it be unfair for Defendants to choose her venue and in doing so preclude valid claims within this Courts jurisdiction, but, federal law conflicts with her position. According to 28 U.S.C. §1441(f), a Federal court is not precluded from hearing any action that the State court originally lacked jurisdiction. Therefore, Defendants' request to dismiss Plaintiff's

11

above referenced causes of action should be denied and Plaintiff should be allowed to go forward with all matters identified within her Complaint.

**5. WHETHER DORINE OLSON WAS AN EMPLOYEE OF NCH HEALTHCARE SYSTEM, INC. IS A GENUINE QUESTION OF MATERIAL FACT; THEREFORE, THEIR VIABILITY AS A DEFENDANT IN THIS LAWSUIT CANNOT BE DISMISSED AT SUMMARY JUDGMENT.**

Defendants argument that using the accepted "integrated employer" enterprise theory or "single employer" enterprise theories will result in a finding that NCH Healthcare Systems, Inc. is not liable in this action is not supported by their documents filed with the FL Department of State Division of Corporations; the case law on this issue; or Defendants' witnesses (Exh. E 5:14–16; 58:14-18; Exh. P 5:23-25; 6:1-8, 15-17; Exh. U, Defendants' Incorporations Documents)[6]. *Long v. Aronov Realty Mgmt.*, 645 F. Supp. 2d 1008 (M.D. Ala. 2009), describes the above referenced theories as follows:

> *A "single employer" situation exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" The single employer standard is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise.'"*

In order to determine whether two or more companies are "integrated employers" courts have looked at the totality of the four factors: (I) interrelation between the operations of the two employers; (2) centralized control of the labor relations; (3) common management; (4) common ownership. *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253,1257 (11th Cir. 2004) (quoting 29 C.F.R. § 825. 104(c)(2)).

According to the Defendants' Articles of Incorporations, both of the Defendants are in the same type of business; share identical officers on their board of directors; have the same registered agent; as well as the same mailing and principal place of business address (Exh. U). All of these factors support a showing that the Court should consider Naples Community Hospital, Inc. and NCH Healthcare Systems, Inc., a "single employer". *Long v. Aronov Realty Mgmt.*, 645 F. Supp. 2d 1008, 1029 (M.D. Ala. 2009)(quoting *Clinton's Ditch Coop. Co. v. NRLB*, 778 F.2d 132, 137 (2d Cir. 1985); McKenzie *v. Davenport-Harris Funeral Home*, 834 F. 2d 930 (11th Cir. 1987)

---

[6] see *Long v. Aronov Realty Mgmt.*, 645 F. Supp. 2d 1008 (M.D. Ala. 2009); *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253 (11th Cir. 2004); *McKenzie v. Davenport-Harris Funeral Home*, 834 F. 2d 930 (11th Cir. 1987); *McCulley v. Allstate Tech. Servs.*, No. 04-0115-WS-B , 2005 U.S. Dist. LEXIS 41550, at * 112-13 (S.D. Ala. Jun. 21, 2005); *Cruz-Lovo v. Ryder System, Inc.*, 298 F. Supp.2d 1248 (S.D. Fla. 2003).

Additionally, contrary to Defendants' assertion, *Cruz-Lovo v. Ryder System, Inc.*, 298 F. Supp. 2d 1248 (S.D. Fla. 2003), is not inconsistent with the Plaintiff's position. Unlike *Cruz-Lovo*, the hospital's regulations for hiring, firing, promotion, etc. are governed by a policies and procedures manual entitled "NCH Healthcare System Employee Handbook". *Cruz-Lovo v. Ryder System, Inc.*, 298 F. Supp.2d 1248 (S.D. Fla. 2003)(Ex. V – Portions of NCH Healthcare System Employee Handbook)[7]. Revisions to policies and procedures within Naples Community Hosptial, Inc. and NCH Healthcare System, Inc. occur through a "policy and procedure committee" which consists primarily of departmental heads from both entities (Exh. E 10:17-25; 11:13-16). Linda Gipson, who was the system chief nursing officer for NCH Healthcare Systems, Inc. during the period at issue, was also Dorine Olson's supervisor (Exh. P 8:3–10). How could this be possible if Mrs. Olson was only an employee of the hospital? Additionally, according to the Human Resources Director Renee Thigpen, the HR department is located at the same address as the address stated in the incorporation articles from NCH Healthcare System, Inc. (Exh. E 7:11-15; Exh. U). Thigpen further testified that she was responsible for creating the job titles and descriptions of the employees for both entities (Exh. E 7:16-20). Lastly, Thigpen, on direct and cross examination during her deposition, testified that her "official" employer was Naples Community Hospital, Inc. **and** NCH Healthcare System, Inc. (bold added for emphasis) (Exh. E 5:14–16; 58:14–18).

Defendants have failed to produce any evidence to support their argument that these two parties should not be considered a "single employer". *Long v. Aronov Realty Mgmt.*, 645 F. Supp. 2d 1008, 1029 (M.D. Ala. 2009) (quoting *Clinton's Ditch Coop. Co. v. NRLB*, 778 F.2d 132, 137 (2d Cir. 1985) Therefore, the Court should allow this lawsuit to proceed with both parties named as Defendants.

6.   PLAINTIFF'S TERMINATION WAS A PRETEXT FOR DISCRIMINATION.

Defendants' Motion for Summary Judgment should not be granted as Plaintiff has presented sufficient evidence that a fact finder could reasonably "disbelieve the Defendant's articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendant's] action". *Stewart v. Rutgers, State Univ.,* 120 F.3d 426, 1997 U.S. App. (3RD Cir. 1978)  Defendants' basic argument against pretext is similar to that presented by the

---

[7] Page eleven of the handbook clarifies that this book is actually a description of the policies and the exact policies are found on the NCH internal website.

employer in *Biggs v. State of Florida, Board of Regents*, 1998 U.S. Dist. LEXIS 21273. In *Biggs*, the Defendant's position was that the employer has offered evidence of a legitimate, non-discriminatory reason for their action and that the Plaintiff must present "*concrete* evidence in the form of *specific facts*" demonstrating that the reason was only a pretext for unlawful discrimination *Biggs,* 1998 U.S. Dist. LEXIS 21273, 20 *citing Davis v. AT&T,* 846 F. Supp. 967, 969 (M.D. Fla. 1993). However, *Biggs* goes on to say that the relevant inquiry in a summary judgment motion is "…whether a reasonable person could infer discrimination *based on the facts presented,…*" (*Id. citing Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207 (11th Cir. 1997). The Court in *Biggs* found that the Plaintiff had produced no evidence where a jury might infer discrimination and unlike the instant case, Biggs' record consisted of several statements from coworkers attesting to his boorish behavior (*Id.* at 21). Plaintiff's fact pattern is the opposite of *Biggs* (*Biggs v. State of Florida, Board of Regents*, 1998 U.S. Dist. LEXIS 21273). According to Thigpen, prior to her promotion, Mrs. Olson had an "excellent" employment record (Exh. E 28:18-23). Mrs. Olson's work history, prior to her promotion, is inconsistent with the poor performance reflected in the statements by Defendants' witnesses, especially, Melody Bacon and Linda Gipson. Furthermore, if Mrs. Olson's performance was indeed substandard, including, frequent long periods of time away from her desk, the Defendants have not produced any evidence to support why they transferred her to the position of unit secretary after they fired her from the TNR position. According to Linda Gipson, who in 2009 was Defendants' Chief Nursing Officer, issues such as "insufficient notice"; "tardiness"; "leaving the staff office unattended" for 30 – 45 minutes would be problematic in the unit secretary position (Exh. P 42:9–22). This, therefore, presents the unanswered question of why place an employee in such a position if she has indeed proved to have problems in the above cited areas which are valuable in the next position. Therefore, a reasonable person could infer discrimination based on these facts (*Id. citing Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207 (11th Cir. 1997)). Plaintiff is not merely stating that her termination was wrong or a mistake, but, the evidence shows "weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons'. (*Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 433, 1997 U.S. App. LEXIS 1978) citing *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1990)).

14

7. **PLAINTIFF ALLEGED BOTH FMLA RETALIATION AND INTERFERENCE CAUSES OF ACTION IN COUNT IV OF THE COMPLAINT.**

In total, there are two causes of action under FMLA: first, an interference claim, "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act." (29 U.S.C. § 2615(a)(1); *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001)). Second, a retaliation claim where "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." (29 U.S.C. § 2615(a)(1) & (a)(2); *Strickland*, 239 F.3d at 1206). In her Complaint, Plaintiff alleged Defendants' violation of FMLA in general, which includes both interference with her substantive rights and intentional discrimination by Defendants (Doc. No. 28, – Amended Complaint, Count IV, ¶¶ 44-50).

8. **DEFENDANTS RETALIATED AGAINST MRS. OLSON WITHIN THE MEANING OF FMLA BECAUSE DEFENDANTS KNEW PLAINTIFF WAS ON FMLA LEAVE AND THEN TERMINATED MRS. OLSON WHILE SHE WAS STILL ON THE FMLA LEAVE.**

In the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (*Strickland*, 239 F.3d at 1207). In order to establish a *prima facie* case for retaliation, Plaintiff must show that: (1) Plaintiff was engaged in the activity protected by statute; (2) Plaintiff suffered an adverse employment decision; and (3) there was a causal relationship between the activity and the decision. (*Strickland*, 239 F.3d at 1207).

    a. **Mrs. Olson engaged in protective activity and her employer made an adverse employment decision while she was still on the FMLA leave.**

To establish statutorily protected activity under FMLA, Plaintiff must show that Plaintiff engaged in conduct "'which is the precipitating cause for the retaliation of termination of employment.'" (*Pashoian v. GTE Directories*, 208 F.Supp. 2d 1293, 1303 (M.D. Fla. 2002) citing *Morehardt v. Spirit Airlines, Inc.*, 174 F. Supp. 2d 1272, 1281 (M.D. Fla. 2001)). Hence, the FMLA leave Mrs. Olson "has taken, or requests to take, must be leave that [s]he is eligible for and is entitled to take under the FMLA." (*Pashoian*, 208 F.Supp. at 1303). Here, there is no dispute that Mrs. Olson was eligible for FMLA (Doc. No. 41, pp. 19-20). Furthermore, it is undisputed that Mrs. Olson was terminated. Therefore, there was

an adverse employment decision on the part of Defendants. As such Mrs. Olson engaged in a protected activity and suffered an adverse employment decision.

> **b. There was a causal connection between Mrs. Olson's FMLA leave and termination because it is undisputed that Defendants knew about Mrs. Olson's FMLA leave and terminated her while she was still on the leave.**

In order to establish a causal connection, Plaintiff must show that (a) the decision-maker was aware of the protective conduct, and (b) "the protected activity and adverse action were not wholly unrelated." (*Pashoian*, 208 F.Supp. at 1303 quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d at 587).

Apart from a situation where there is "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in a protected conduct," "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." (*Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Close temporal proximity exists where the Plaintiff was terminated while on the FMLA leave. (*Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008) ("the close temporal proximity between the [FMLA leave and termination]—[the Plaintiff] was terminated while on FMLA leave—is more than sufficient to create a genuine issue of material fact of causal connection.")).

In this case, there is no dispute that Defendants were aware of the protective conduct by Mrs. Olson (Doc. No. 41, p. 3). Furthermore, Mrs. Olson was terminated while on FMLA leave (Exh. A. ¶ 7). Since Defendants admit they knew Mrs. Olson was on FMLA leave (Doc. No. 41, p. 3), the exception mentioned in *Brungart* does not apply. Therefore, there is a genuine issue of material fact as to the causal relationship between Mrs. Olson's FMLA leave and her termination. (*Martin*, 543 F.3d at 1268).

In sum, because Defendants terminated Mrs. Olson while she was on FMLA leave and while being aware that she was on FMLA leave, there is a genuine issue of material fact as to whether Defendants exercised retaliation against Mrs. Olson contemplated by FMLA.

**9. DEFENDANTS INTEREFERED WITH MRS. OLSON'S RIGHT TO BE RESTORED TO A POSITION EQUIVALENT OF TNR BECAUSE PLAINTIFF WAS STILL ON INTERMITTENT FMLA LEAVE WHEN TERMINATED.**

In order to establish an FMLA interference claim, an employee must show that she was denied a benefit to which she was entitled under the Act. (29 U.S.C. § 2615(a)(1)). After FMLA leave, an employee has the right "to be restored by the employer to the position of employment held by the

16

employee when the leave commenced" or to an equivalent position. (29 U.S.C. § 2614(a)(1)(A); 29 C.F.R. § 825.214(a)).

An employer can deny reinstatement "if it can demonstrate that it would have discharged the employee had he not been on FMLA leave." (*Martin*, 543 F.3d at 1267; *see also* 29 U.S.C. § 2614(a)(3)(B) (an employee returning from FMLA leave is not entitled to "any right, benefit, or position of employment other than any . . . to which the employee would have been entitled had the employee not taken the leave")). "In other words, if an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable." (*Strickland*, 239 F.3d at 1208).

In Martin, the Plaintiff was performing his job duties unsatisfactorily and was given a certain amount of time to improve by his employer. (*Martin*, 543 F.3d at 1264). However, over three weeks before the improvement period had ran out, the Plaintiff had to go on FMLA leave to take care of his granddaughter. (*Id.*). While the Plaintiff was still on FMLA leave he was terminated. (*Id.*). The Court held that because the Plaintiff still had over three weeks to complete his improvement plan, but which he was unable to complete due to FMLA leave, there was a genuine issue of material fact as to whether the Plaintiff's employer interfered with his right to reinstate the contract. (*Id.*).

In the case, Mrs. Olson was promoted to the TNR position after she went on FMLA leave, which makes the present case different from other cases.  However, for the present purposes, the present case should be treated as if Mrs. Olson held TNR position before the FMLA leave commenced. Employers should not be allowed FMLA statute simply by promoting a Plaintiff on FMLA leave to a position they know a Plaintiff may not be able to perform.  For instance, here the fact that Defendants knew Mrs. Olson had no prior management experience would suggest that they promoted her to TNR position while knowing that she may not be able to perform it.

Because Mrs. Olson took time off work as necessary or adjusted her schedule in order to be able to make doctor's appointments, her FMLA leave was intermittent.  Such intermittent leave is permitted under the FMLA. (29 U.S.C. § 2612(a)(1)(D) (an employee is entitled to FMLA leave if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee"); 29 U.S.C. § 2612(b)(1) (leave under 29 U.S.C. § 2612(a)(1)(D), "may be taken intermittently or on a reduced leave schedule when medically necessary")).

17

Since Mrs. Olson was still on intermittent FMLA leave when she was terminated, there is a genuine issue of material fact as to whether Defendants interfered with her right to improve. Taking the facts in the light most favorable to Plaintiff, it is reasonable to conclude that similarly to the situation in *Martin*, where the Plaintiff could not complete his improvement plan due to being on FMLA leave, Mrs. Olson could not properly complete her improvement period because she was on intermittent FMLA leave during that entire period. (*Martin*, 543 F.3d at 1264) Therefore, Defendants Motion for Summary Judgment should be denied.

## 10. DEFENDANTS' CONDUCT WAS EXTREME AND OUTRAGEOUS BECAUSE DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT THEIR BEHAVIOR WOULD CAUSE SEVERE EMOTIONAL DISTRESS AND DEATH TO PLAINTIFF.

One of the requirements for a successful IIED claim is that the employer's conduct towards Plaintiff be extreme and outrageous. (*Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007)). Defendants' contends that Plaintiff does not have an IIED claim because Defendants' conduct was not extreme and outrageous.

In the context of a claim of intentional infliction of emotional distress, "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." (*Id.* quoting **Restatement (Second) of Torts**, § 46, cmt. f).

Here, Defendants' conduct was extreme and outrageous to the extent that it may be reasonable to conclude that by terminating Mrs. Olson it would increase her stress and possibly increase the effects of her breast cancer. Mrs. Olson was peculiarly susceptible to emotional distress and its effects due to the complications emotional distress could cause for her breast cancer illness. During her deposition, Lynn indicated that Mrs. Olson was "distraught" and "totally shocked" over her termination (Exh. I 22:15, 26:25). Defendants never told Mrs. Olson that she performed her job inadequately (Exh. G). When asked about how she was doing, Mrs. Olson was told not to worry (Exh. G at OLSON-000004). And yet, on August 27, 2009, Defendants went back on their words and fired Mrs. Olson without any warning. Furthermore, Defendants promoted Mrs. Olson knowing that she had no management experience and knowing that she may have difficulties performing her duties due to breast cancer (Exh. F ¶¶ 4, 5). Therefore, there is a genuine issue of material fact as to whether Plaintiff has an IIED claim against Defendants.

11. **PLAINTIFF'S NEGLIGENCE CLAIM MUST STAND EVEN ABSENT ANY PHYSICAL IMPACT BECAUSE DEFENDANTS' CONDUCT CAUSED PLAINTIFF'S BREAST CANCER TO WORSEN AND CONTRIBUTED TO PLAINTIFF'S DEATH.**

The physical impact rule provides that "before a Plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress suffered must flow from physical injuries the Plaintiff sustained in an impact." (*Reynolds v. State Farm Mut. Auto. Ins. Co.*, 611 So. 2d 1294, 1296 (Fla. 4th DCA 1992)). "Thus, the impact rule precludes the recovery of damages for negligent infliction of emotional distress unless the emotional distress arises directly from the physical injuries sustained by the Plaintiff in the impact." (*Id.*)

Here, it may be reasonable to conclude that Mrs. Olson's severe emotional distress caused her breast cancer to worsen and might have even caused her death. The worsening of Mrs. Olson's breast cancer may have caused further emotional distress which is not barred by the impact rule. Thus, given the circumstances in the present case, there is a genuine issue of material fact as to whether Defendants' conduct led to severe emotional distress which caused Mrs. Olson's breast cancer to worsen, caused further severe emotional distress, and eventually caused her death. As such, Defendants' Motion for Summary Judgment on Plaintiff's negligence claim must be denied.

## CONCLUSION

WHEREFORE, based upon the facts of this case as argued in this Memorandum of Law, Plaintiff, Lucinda Marie Jenks f/k/a Lucinda Marie Peterson, personal representative for the Estate of Dorine Olson, respectfully requests that the Defendants' Motion For Summary Judgment be DENIED, and she be awarded such relief as may be appropriate, including damages, costs, attorney fees, and reimbursement for past salary and benefits, all of which came about as a result of discriminatory employment practices.

Respectfully submitted,

s/<u>Karen L. Nixon</u>
Karen L. Nixon,
Florida Bar No.0038576
Douglas D. Mohney
Florida Bar No.0997500
Carol Avard
Florida Bar No. 0834221
Attorneys for Plaintiff

          Post Office Box 101110
          Cape Coral, FL  33910-1110
          (239) 945-0808 Phone
          E-Mail:  knixon@avardlaw.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 8, 2011 a true and correct copy of the foregoing has electronically been filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Tammie L. Rattray
Ford and Harrison, LLP
101 E. Kennedy Boulevard
Tampa, FL 33602

          */s/Karen L. Nixon*
          Karen L. Nixon
          Attorney for Plaintiff
          P.O. Box 101110
          Cape Coral, FL 33910
          FL Bar No. 0038576
          (239)945-0808
          E-Mail:  knixon@avardlaw.com