# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**LUCINDA MARIE JENKS f/k/a LUCINDA MARIE PETERSON, Personal Representative for the Estate of DORINE OLSON,**

**Plaintiff,**

-vs-                                      Case No.  2:10-cv-197-FtM-DNF

**NAPLES COMMUNITY HOSPITAL, INC., and NCH HEALTHCARE SYSTEM, INC.,**

**Defendants.**

_____/

## OPINION AND ORDER

This Cause is before the Court on Defendants, Naples Community Hospital, Inc. and NCH Healthcare System, Inc.'s Dispositive Motion for Summary Judgment (Doc. 41) filed on May 18, 2011, and the Plaintiff, Lucinda Marie Jenks, as Personal Representative for the Estate of Dorine Olson's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 47) filed on June 8, 2011.  The Defendants move for summary judgment on all claims brought by the Plaintiff. The parties consented to proceed before a United States Magistrate Judge and an Order (Doc. 66) was entered on September 27, 2011 approving the consent.

### I.  Standard for Summary Judgment

Under FED.R.CIV.P. 56(c) a motion for summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

-1-

to any material fact and that the movant is entitled to judgment as a matter of law." The burden of establishing the absence of a genuine material fact is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Baby Buddies, Inc. v. Toys R Us, Inc.,* 611 F.3d 1308, 1314 (11th Cir. 2010) (citation omitted). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id*.

Once this burden is met the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp*., 477 U.S. at 324, *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000). In order to avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, *Hilburn v. Murata Elecs. N. Am., Inc.* 181 F.3d 1220, 1225 (11th Cir. 1999). When the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Anderson*, 477 U.S. 248.

In making this determination, the Court must view all of the evidence and draw all reasonable inferences in a light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)*; Tana v. Dantanna's,* 611 F.3d 767, 772 (11th Cir.2010)*.* The

Court does not weigh conflicting evidence or make credibility determinations. *Hilburn,* 181 F.3d at

1225 (11th Cir. 1999).  "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial." *Tullius v. Albright,* 240 F.3d 1317, 1320 (11th Cir. 2001),

*citing*, *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1369 (11th Cir. 1982).


## II.  Undisputed Facts for Summary Judgment Purposes

Dorine Olson, the decedent, began her employment with the Defendant, Naples Community

Hospital, Inc.[1] ("Hospital") from August 20, 1990 through the date of her death on June 12, 2010.[2]

(Doc. 48, Thigpen Decl. Exh. A, ¶4, 7).  Ms. Olson had various non-managerial positions with the

Hospital throughout her career there, including Unit Secretary, Certified Nursing Assistant in The

Nursing Registry ("TNR"), and Patient Care Technician.  (Doc. 48, Thigpen Decl. Exh. A, ¶4,5).  In

December 2003, Ms. Olson transferred to the non-managerial position of Staffing Assistant, which

title was changed to Administrative Assistant in TNR in 2005.  (Doc. 48, Thigpen Decl. Exh. A, ¶5).

Ms. Olson had received commendations and excellent employee reviews prior to taking her first

managerial job as TNR Coordinator.  (Doc. 48, Exh. D).

On February 2,  2009, Human Resources at the Hospital received Ms. Olson's request for

Family and Medical Leave Act ("FMLA") leave due to her diagnosis of breast cancer.  (Doc. 48,

---

[1]  In footnote 3 in the Motion for Summary Judgment (Doc. 41), the Defendants argue that
Naples Community Hospital, Inc. was Ms. Olson's employer, and that NCH Healthcare System, Inc.
does not have any employees and was not Ms. Olson's employer. In the Plaintiff's Memorandum in
Opposition (Doc. 47), the Plaintiff argues that both Defendants were Ms. Olson's employer. The fact
of whether NCH Healthcare System, Inc. was Ms. Olson's employer is in dispute.

[2]  Ms. Olson had a break in service from March 1996 through February 7, 1997 in anticipation
of the birth of a child.  (Doc. 48, Exh. A, ¶4).  This break in service is not at issue in this case.

Thigpen Decl. Exh. A, ¶6, Doc. 42, Exh. C). Ms. Olson's physician, Joel Grossman, M.D. requested intermittent leave on Ms. Olson's behalf, stating that Ms. Olson had advanced breast cancer and would require leave for chemotherapy and "aggressive treatments." (Doc. 48, Thigpen Decl. Exh. A, ¶6, Doc. 42, Exh. C, FMLA form).    On February 4, 2009, the Hospital approved Ms. Olson's FMLA leave. (Doc. 42, Exh. C). Human Resources notified Ms. Olson's supervisors, Barry Hawthorne, the interim Assistant Chief Nursing Officer and Director of TNR, and Linda Gipson, Vice President and Chief Nursing Officer of Ms. Olson's FMLA leave so they could allow her to leave work as needed. (Doc. 48, Thigpen Decl. Exh. A, ¶6). Ms. Olson shared her medical problems with other employees at the Hospital and her diagnosis and treatments were common knowledge of the Hospital staff. (Doc. 48, Thigpen Decl. Exh. A¶6).

Ms. Olson used her FMLA leave as needed throughout the remainder of her employment with the Hospital. (Doc. 48, Thigpen Decl. Exh. A ¶7). Ms. Olson had not exhausted her entitlement to FMLA leave before she passed away in June 2010. (Doc. 48, Thigpen Decl. Exh. A ¶7). Human Resources has no record of Ms. Olson ever complaining that she was unable to use or take leave as needed. (Doc. 48, Thigpen Decl. Exh. A ¶7). Ms. Olson was treated at the Hospital and ultimately passed away there. (Doc. 48, Thigpen Decl. Exh. A ¶7).

In 2009, Barry Hawthorne was the interim Director of TNR at the Hospital. (Doc. 42, Gipson Depo. Exh. 1, p. 8).   Linda Gipson, Chief Nursing Officer and Hawthorne's supervisor determined that TNR needed significant "process improvement" at that time. (Doc. 42, Gipson Depo, Exh. 1, p. 8; Doc. 48, Hawthorne Decl. Exh. F, ¶3).   Gipson asked Hawthorne to focus on staffing processes and procedures and updating them when needed. (Doc. 48, Hawthorne Decl. Exh. F, ¶3). Hawthorne determined that a new mid-level managerial position in TNR needed to be created, titled "TNR

Coordinator" and this position would report directly to him.  (Doc. 48,  Hawthorne Decl., Exh. F, ¶3, Doc. 42, Gipson Depo. Exh. 1, p. 8).  He obtained approval for the position.  (Doc. 48, Hawthorne Decl. Exh. F, ¶3).  TNR ensures that the right staff in the right quantities is at the right place at the right time throughout the hospital.  (Doc. 42, Gipson Depo. Exh. 1 p. 43).  TNR Coordinator ensures that the staffing is appropriate to properly care for patients, while at the same time balances the financial requirements of the staffing so as not to overstaff and cause a financial deficit for the Hospital.  (Doc. 42, Gipson Depo, Exh. 1, p. 44).  It is a managerial position, and was much more challenging than Ms. Olson's prior position as TNR Administrative Assistant.  (Doc. 42, Gipson Depo, Exh. 1,  p. 44; Doc. 42, Thigpen Decl. Exh. 7. ¶8).

Hawthorne decided to promote Ms. Olson to the new position of TNR Coordinator. (Doc. 48, Hawthorne Decl. Exh F ¶4).  He consulted with Ms. Gipson prior to promoting Ms. Olson.  (Doc. 48, Hawthorne Decl. Exh F ¶4).  Ms. Gipson had concerns about promoting Ms. Olson to this position including whether Ms. Olson was a good fit for the increased responsibilities of the new position and her other concern was that Ms. Olson had not previously been in a managerial position.  (Doc. 42, Gipson Depo. Exh. 1, p. 16; Doc. 48, Hawthorne Decl. Exh. F, ¶4).  Hawthorne "campaigned" for the promotion for Ms. Olson truly believing that she could handle the new position, and agreeing to provide supervision, support and education to her.  (Doc. 42, Gipson Depo. Exh. 1, p. 16;  Doc. 48, Hawthorne Decl. Exh. F, ¶4).  Hawthorne did express concerns to Gipson that Ms. Olson may not have had the cognitive ability, the mathematical skills, and the anticipatory skills to be successful in the position because she had never had the opportunity to use these skills in her prior positions.  (Doc. 42, Gipson Depo. Exh. 1, p. 16-17).  Hawthorne was hopeful that Ms. Olson would be able to handle

the new position, and he was going to take her "under his wing and teach her."  ((Doc. 42, Gipson Depo. Exh. 1, p. 17).

On March 15, 2009, Ms. Olson was promoted to the new position of TNR Coordinator.  (Doc. 42, Thigpen Decl. Exh. 7, ¶8).  In accordance with Hospital policies, Ms. Olson began a 90-day introductory/probationary period.  (Doc. 42, Thigpen Decl. Exh. 7, ¶9).  The purpose of the introductory/probationary period is to determine whether the new employee is a good fit for the position, and whether the employee likes the new job.  (Doc. 42, Thigpen Decl. Exh. 7, ¶9).  During the probationary period, Hawthorne interacted with Ms. Olson almost every day, and he observed her performance closely.  (Doc. 48, Hawthorne Decl. Exh. F, ¶5).  Hawthorne found Ms. Olson to be struggling with the position from the outset.  (Doc. 48, Hawthorne Decl. Exh. F, ¶6).  TNR Coordinator required "flexibility, forethought, and strategic planning" and according to Hawthorne, Ms. Olson never managed to transition to this "higher level functioning."  (Doc. 48, Hawthorne Decl. Exh. F, ¶6).

Hawthorne found that Ms. Olson's performance did improve over the 90-day probationary period, but he continued to be concerned that she would not succeed in her new position.  (Doc. 48, Hawthorne Decl. Exh. F, ¶7).  Hawthorne consulted Thigpen in the Hospital's Human Resources Department about the possibility of extending Ms. Olson's probationary period.  (Doc. 48, Hawthorne Decl. Exh. F, ¶7; Doc. 42, Thigpen Decl. Exh. 7, ¶10).  Hawthorne told Thigpen that he wanted to continue the probationary period because Ms. Olson was struggling to meet the essential job requirements and he wanted to give her additional time to improve her performance.  (Doc. 42, Thigpen Decl. Exh. 7 ¶ 10).  Thigpen approved Hawthorne's request for extension of the probationary

-6-

period, and Ms. Olson's probationary period was extended for an additional 60 days.  (Doc. 42, Thigpen Decl. Exh. 7, ¶10).

On June 29, 2009, Hawthorne extended the introductory/probationary period, and  met with Ms. Olson to extend the probationary period and review her performance and the areas where she was not meeting the standards of the job.  (Doc. 48, Hawthorne Decl. Exh. F, ¶8).  Hawthorne did not "sugar coat" the issues and was explicit in setting forth Ms. Olson's deficiencies in her job performance and Hawthorne's expectations for improvement.  (Doc. 48, Hawthorne Decl. Exh. F, ¶8)[3].  Ms. Olson's Extension of Introductory Period form signed by Hawthorne and Ms. Olson had a check mark on the statement that "[t]his employee has exhibited satisfactory progress and met the requirements in the performance of his/her job description, accountabilities, and standards of behavior." (Doc. 48, Exh. A of Exh. M).  Further the box was checked as to "[c]ompleted the skills checklist and department checklist." (Doc. 48, Exh. A of Exh. M).  In addition,  Hawthorne listed the following areas in the Extension of Introductory Period form in the section "TO BE COMPLETED ONLY IF INTRODUCTORY PERIOD EXTENDED: Accountabilities, performance, and/or standards of behavior requiring further development or improvement."

> 1. Improve and get ahead of evaluations getting completed ahead of schedule.
> 2. Develop plan & implement change to staffing office to 24/7. Reassess current work/projects/assignments.
> 3. Improve system of sec'y [secretary] support for ACNO through self/staffing specialists.
> 4. Implement education/training/Performance Improvement Plan wi th current team.
> 5. AcuStaff timeline & plan of action, with ACNO & Nursing leadership team to improve consistency.
> Comments: Ms. Olson started the TNR Coordinator 90 days ago and while she has grown and shown improved performance, the true impact of this role is just now

---

[3]  During the meeting of June 29, 2009, Ms. Olson admitted that she was involved in an inappropriate relationship with co-worker Lou LaFemina.  (Doc. 48, Hawthorne Decl. Exh. F, ¶8).

> solidifying. Some slips (evals, per diem position, staff encounters, etc.) but learning
> well from each case. These next 60 days need to solidify her performance & on-going
> success! I'm supportive of Dorine excelling these next 60 days & being successful w/
> [with] this role.

(Doc. 48, Hawthorne Decl. Exh. F, ¶8;  Doc. 48, Exh.  A of Exh. M).  Ms. Olson received a copy of

the Extension of Introductory Period form and showed it to her co-worker Louis LaFemina.  (Doc. 42,

Louis LaFemina Depo. Exh. 3, p. 28-29).

     Shortly thereafter, on July 31, 2009, Hawthorne left the employ of the Hospital.  (Doc. 48,

Hawthorne Decl. Exh. F, ¶9).  Prior to leaving the Hospital, Hawthorne met with Gipson, and the new

interim Director for TNR, Melody Bacon. (Doc. 48, Hawthorne Decl. Exh. F, ¶9, 10).  Gipson recalls

that Hawthorne regretted offering TNR Coordinator position to Ms. Olson because despite his help,

he did not feel that she was able to meet the job expectations that the department required.  (Doc. 42,

Thigpen Depo. Exh. 1, p. 25).  Hawthorne told Gipson that he extended Ms. Olson's probation hoping

that she could meet the expectations of her new supervisor, but he felt that he had made an error in

recommending her.   (Doc. 42, Thigpen Depo. Exh. 1, p. 25). He apologized to Ms. Gipson for

selecting Ms. Olson for the position as he was afraid that she would never be able to succeed and he

would not be at the Hospital "to manage the process through to the end, whatever that ended up

being."  (Doc. 48, Hawthorne Decl. Exh. F, ¶9).

     In his meeting with Bacon, the new interim  Director for TNR, Hawthorne told Bacon about

Olson's extension of probation.  (Doc. 48, Hawthorne Decl. Exh. F, ¶10).  Hawthorne told Bacon

about the areas where Ms. Olson was deficient, and together they reviewed the Extension of

Introductory Period form.  (Doc. 42, Bacon Decl. Exh. 5, ¶4).   Bacon wanted to ensure that she

evaluated Ms. Olson on the areas listed as deficient in the Extension of Introductory Period form.

(Doc. 42, Bacon Decl. Exh. 5, ¶4).  When she accepted the position as interim Director for TNR, Bacon knew that Ms. Olson had breast cancer as it was common knowledge at the Hospital, Ms. Olson was open about her diagnosis, and the Hospital had numerous fundraisers and drives for Ms. Olson. (Doc. 42, Bacon Decl. Exh. 5, ¶5).

After taking the interim Director for TNR position, Bacon interacted with Ms. Olson virtually every day.  (Doc. 42, Bacon Decl. Exh. 5, ¶7).  Bacon found that Ms. Olson was "over her head" meaning that TNR Coordinator position required a person to multi-task and Ms. Olson was unable to keep up with the requirements of the position.   (Doc. 42, Bacon Decl. Exh. 5, ¶7). Thigpen knew that Bacon was following Hawthorne's action plan as she supervised Ms. Olson's performance in the specific areas listed by Hawthorne.  (Doc. 48, Thigpen Decl. Exh. A, ¶12).  Bacon developed a chart to track Ms. Olson's performance on a daily basis.  (Doc. 42, Bacon Decl. Exh. 5, ¶8).   On this chart, Bacon listed the following areas where Ms. Olson was deficient:

With respect to evaluations, a Unit Secretary had to wait 45 minutes on August 4 after Ms. Olson forgot about her evaluation, and Ms. Olson did not complete the evaluation process until the end of the month, August 25.

With respect to our education and training goals, on August 4, I asked Ms. Olson to schedule staff for cross training on a our electronic Bed Board (a system that shows room occupancy) and on August 5, I asked her to update the evaluation forms for TNR staff and provide me with a list of cross-trained employees (as that assists us with staffing needs throughout the hospital); as of August 18, none of these tasks were completed, or as far as I could see, even started.

With respect to Acustaff (a system that tracks employee hours), I learned that our Payroll staff had requested coding information from Ms. Olson on August 10 which it had not received as of August 26; I instructed Ms. Olson to complete that project immediately, as it was impacting another department.

As also outlined in the chart under "miscellaneous," in addition to everyday interactions, I met with Ms. Olson specifically regarding her Extension on August 5, August 18, and August 25.

-9-

(Doc. 42, Bacon Decl. Exh. 5, ¶8, and Exh. B to Bacon Decl.).   At the conclusion of the extended probationary period, Bacon determined that Ms. Olson had not met the goals outlines in the Extension of Introductory Period form.  (Doc. 42, Bacon Decl. Exh. 5, ¶ 10).  Bacon discussed Ms. Olson's performance with Bacon's supervisor Gipson, and also with Thigpen telling Thigpen that Ms. Olson had not succeeded in achieving the goals set forth by Hawthorne.  (Doc. 42, Bacon Decl. Exh. 5, ¶10; Doc. 42, Thigpen Decl. Exh. 1, ¶12).   Thigpen asked Bacon to outline the areas where Ms. Olson had failed to meet the goals set forth in the Extension of The Introductory Period form, which she did.  (Doc. 42, Bacon Decl. Exh. 5, ¶10; Doc. 42, Thigpen Decl. Exh. 1, ¶12).   Bacon decided to remove Olson from TNR Coordinator position, and Thigpen approved.  (Doc. 42, Bacon Decl. Exh. 5, ¶10; Doc. 42, Thigpen Decl. Exh. 1, ¶12).

On August 27, 2009, Bacon prepared an Extension of Introductory Review form indicating that Ms. Olson did not satisfactorily complete her probationary period and the extension of her probationary period.  (Doc. 42, Bacon Decl. Exh. 5, ¶12, and Exh. C to Bacon Decl.).  On August 27, 2009, Bacon and Gipson met with Ms. Olson.  (Doc. 42, Bacon Decl. Exh. 5, ¶11).  Bacon and Gipson told Ms. Olson that she had not successfully competed her Extension.  (Doc. 42, Bacon Decl. Exh. 5, ¶11).  Bacon referred Ms. Olson to Human Resources for assistance locating a new position.  (Doc. 42, Bacon Decl. Exh. 5, ¶11).  Bacon clarified the list of deficiencies that she attached to the Extension form by saying that Ms. Olson had a habit of leaving the office frequently to socialize with co-worker Lou LaFemina, and Ms. Olson failed to provide Bacon with notice of her scheduled doctor's appointments, but Bacon would always allow Ms. Olson to attend the doctor's appointment even if Ms. Olson failed to give Bacon notice.  (Doc. 42, Bacon Decl. Exh. 5, ¶12).  The lack of notice made it difficult for Bacon to secure coverage for Ms. Olson's work.  (Doc. 42, Bacon Decl. Exh. 5, ¶12).

The Hospital placed Ms. Olson in a Timekeeper position while she searched for a permanent position.  (Doc. 42, Thigpen Decl. Exh. 7, ¶14).  This accommodation was not typical, however the Hospital wanted to ensure that Ms. Olson would not have a break in employment or pay so they placed her in a temporary Timekeeper position.  (Doc. 42, Thigpen Decl. Exh. 7, ¶14).  Ms. Olson obtained a permanent position on September 27, 2009 as a Unit Secretary.  (Doc. 42, Thigpen Decl. Exh. 7, ¶14).  On February 14, 2010, Ms. Olson requested a transfer to a different Unit Secretary position which was approved.  (Doc. 42, Thigpen Decl. Exh. 7, ¶14).  She had this position until her death on June 12, 2010.  (Doc. 42, Thigpen Decl. Exh. 7, ¶14).

### III.  Olson's Diary

Ms. Olson purportedly wrote a brief "diary" or journal of six pages in length.  (Doc. 48, Exh. G).  The "diary" is not signed and has dates within it, but with the exception of August 27, 2009, does not have specific dates related to the entries.  (Doc. 48, Exh. G).  It is unknown when the diary was created or for what purpose.  The diary is handwritten and may have been written at one sitting as the handwriting is very consistent from page to page.  The Defendants assert that the diary is not admissible based upon hearsay.  The Plaintiff argues that the diary is admissible as it is subject to a hearsay exception.

A summary of the contents of the "diary" are as follows.   The diary has an entry which explains that in 2009, Ms. Olson was diagnosed with stage 4 breast cancer which had metastasized to other areas including her spine, ribs, and bones.  (Doc. 48, Exh. G, p. 1).  On February 2, 2009, Ms. Olson completed her FLMA paperwork and informed her immediate boss of the situation.  (Doc. 48, Exh. G, p. 1).  On March 15, 2009 she was promoted to TNR Coordinator.  (Doc. 48, Exh. G, p. 1).

On April 13, 2009, she had a right mastectomy and had her ovaries removed.  (Doc. 48, Exh. G, p. 2).  She returned to work on May 4, 2009, and in February she began chemotherapy treatments which she scheduled on Friday afternoons.  (Doc. 48, Exh. G, p. 2).   On June 26, 2009, Ms. Olson received her 90 day evaluation from Hawthorne and all the boxes were checked.  (Doc. 48, Exh. G, p. 2).  Hawthorne gave her five goals to work towards and achieve.  (Doc. 48, Exh. G, p. 2-3).  Hawthorne extended "it" for 60 days, until August 28, 2009.  (Doc. 48, Exh. G, p. 3). During the 60-day period, Ms. Olson spoke numerous times with Gipson and Bacon about her progress and she "was told I was fine, not to worry."  (Doc. 48, Exh. G, p. 3).

On August 27, 2009, Ms. Olson had a meeting with Bacon and Gipson.  (Doc. 48, Exh. G, p. 3).   Gipson told Ms. Olson that she "was not the right person for the job, the position of TNR Coordinator."  (Doc. 48, Exh. G, p. 4).  She asked what she was doing wrong and no specifics were given.  (Doc. 48, Exh. G, p.4).  Gipson asked if Ms. Olson had been looking at the job postings and Ms. Olson told her no because she did not know she needed to be looking. (Doc. 48, Exh. G, p. 1).  No one had ever told Ms. Olson that she was "messing up, missing things or failing."  (Doc. 48, Exh. G, p. 4).  Whenever she asked how she was doing, she was told she was doing fine, not to worry. (Doc. 48, Exh. G, p. 4).  "I made the comment that I felt like they promoted the person with cancer and now they are changing their mind.  Linda [Gipson] looked at me and said 'to the contrary, because you have cancer we have been more lenient & let you get away with more because no one wanted to hurt my [her] feelings.'"  (Doc. 48, Exh. G, p. 5).   Ms. Olson was told that she had 30 days to find a new position, and that Human Resources was there to help her.  (Doc. 48, Exh. G, p. 5).

## IV.  Analysis

The Defendants assert that there is no admissible evidence from Ms. Olson.  They argue that the unauthenticated, undated diary is not admissible, and that the testimony that supports the Plaintiff's case from Lynn LaFemina or Louis LaFemina is not admissible as it is hearsay.  Further, the Defendants assert that the Plaintiff's claims for discrimination based upon her disability fail as a matter of law as the Defendants did not discriminate against Ms. Olson. Further, the Defendants did not retaliate against Ms. Olson for using FMLA leave, did not participate in any outrageous conduct to inflict intentional emotional distress, and the Plaintiff failed to state a claim for negligent supervision and retention.[4]

### A.  Admissibility of Evidence

#### 1.  Ms. Olson's Diary

The Defendants argue that the purported diary of Ms. Olson is a handwritten, undated, unsigned, and unverified document and therefore, is not admissible as evidence in this case to defeat summary judgment. Pursuant to FED. R. CIV. P. 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." "Generally, evidence inadmissible at trial may not be considered on a motion for summary judgment." *Ekokotu v. Federal Exp. Corp.*, 408 Fed. App'x. 331, 335 (11ᵗʰ Cir. 2011)[5] (citing *Corwin v. Walt Disney World Co.,* 475 F.3d 1239, 1249 (11ᵗʰ Cir. 2007)).  Specifically, inadmissible hearsay cannot be considered on a motion for summary judgment, with the exception that "otherwise admissible

---

[4]  The Plaintiff asserts that Ms. Olson's EEOC charge is admissible evidence.  The Defendants did not object to the admissibility of  the EEOC charge in their Motion for Summary Judgment.

[5]  Eleventh Circuit unpublished opinions are not binding precedent but they may be cited as persuasive authority.  11ᵗʰ Cir. R. 36-2.

evidence may be 'submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form.'" *McCaskill v. Ray*, 279 Fed. App's. 913, 914 (11th Cir. 2008) (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)).  In this case, the diary entries cannot be submitted in any other form then as presented.

The Defendants assert that the unsworn, unsigned, undated diary is hearsay and does not fall within one of the exceptions.[6]  Specifically, the Defendants argue that the diary does not comply with FED. R. EVID. 807, as a residual exception to the hearsay rule. Pursuant to FED. R. EVID. 801(c), "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."   Generally, hearsay is not admissible unless one of the exceptions to the hearsay rule applies.  FED. R. EVID. 802.  Rule 807[7] is the residual exception to the hearsay rule, and "'Congress intended the residual hearsay exception to be used very

---

[6] Although the Defendants assert that counsel for Ms. Olson should have taken her deposition prior to her death, the Court will accept the Plaintiff's statement that even though Ms. Olson was diagnosed with stage 4 breast cancer, her death was sudden.

[7] Rule 807 provides:
A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED. R. EVID. 807.

-14-

rarely, and only in exceptional circumstances,' [citation omitted], and it 'appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.'" *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1279 (11th Cir. 2009) (citations omitted).  The statements must have "'circumstantial guarantees of trustworthiness' equivalent to other hearsay exceptions." *Kincaid v. Autumn Village 2 Assisted Living Facility Ltd. Liability* 2010 WL 1565478 *3 (M.D. Ga. Apr. 19, 2010).

Ms. Olson's diary does not have the guarantees of exceptional trustworthiness required by Rule 807 or found in other exceptions to the hearsay rule.   There is no evidence of when Ms. Olson wrote the diary entries.  Although not substantiated,  it appears that the diary was written on or after August 27, 2009, the date that the Hospital informed Ms. Olson that she was no longer TNR Coordinator. However, how close in time to the meeting is unknown.   According to the Plaintiff's Memorandum (Doc. 47), Ms. Olson filed her Equal Employment Opportunity Commission charge on September 1, 2009, which was within days from the date listed in the diary.   Even assuming that Lynn LaFemina can verify that the writing was Ms. Olson's, the alleged  factual statements in the diary are self-serving and possibly were made in anticipation of litigation, and have no indicia of trustworthiness as is required by Rule 807.   Therefore, the Court does not find that the diary is admissible pursuant to FED. R. EVID. 807.

The Plaintiff asserts that diary should be admitted as evidence of her state of mind under FED. R. EVID. 803(3)[8].  The Plaintiff fails to cite any cases where the state of mind of the individual alleging

---

[8] FED. R. EVID. 803(3) provides:
A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification,

discrimination is relevant.  The Plaintiff argues that whether Ms. Olson was under an incorrect perception that she was performing her job in a satisfactory manner is an issue in this case. The Defendant states that Ms. Olson's state of mind is not relevant.  The Court does not find any cases where the state of mind of the employee who is allegedly subject to discrimination is relevant.  The Plaintiff also asserts that Ms. Olson's diary reflects the state of mind of Gipson and Bacon during the August 27, 2009 meeting.  The state of mind of an employer in a discrimination case may be relevant. *See, Ritchie v. Industrial Steel, Inc.*, 426 Fed. App'x. 867, 872-3 (11th Cir. 2011) (state of mind of decision maker relevant to evidence of pretext), *Van Blarcom v. VCA Antech, Inc.*, 2006 WL 1232828 *3 (M.D. Fla. 2006).  The Plaintiff asserts that the diary entry by Ms. Olson stating that Gipson said to Ms. Olson, "because you have cancer we have been more lenient and let you get away with more because no one wanted to hurt [your] feelings" goes to the state of mind of Gipson in making her employment decision.   The Court finds that this statement is an exception to the hearsay rule as it goes to Gipson's state of mind, and therefore admissible for purposes of summary judgment.  The Court also finds that the other statements in the diary are hearsay and are inadmissible evidence, and will not be considered in this ruling.

### 2.  Testimony of Lynn LaFemina and Louis LaFemina

The Defendants assert that the testimony of Lynn LaFemina and Louis LaFemina[9] that supports the Plaintiff's claim is hearsay and not admissible.  The Plaintiff argues that Ms. Olson's statements

---

or terms of declarant's will.

[9]   The Plaintiff did not respond to the argument that Ms. Olson's statements to  Louis LaFemina are not admissible as hearsay. Therefore, the Court will not consider any of these statements for summary judgment purposes.

to  Lynn LaFemina are an exception to hearsay pursuant to FED. R. EVID. 803(1) as a present sense impression or under FED. R. EVID. 803(2) and (3) as an excited utterance, a then existing mental, emotional condition.  The present sense impression exception is a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." FED. R. EVID. 803(1). When asked when did she speak to Ms. Olson on August 27, 2009, Lynn LaFemina testified that "[i]t was probably that day, that evening, yeah." (Doc. 48, Lynn LaFemina Depo. Exh. I, p. 39).  The meeting was early in the day as Bacon allowed Ms. Olson to take the balance of that day off.  (Doc. 42, Bacon Decl. Exh. 5, p. 5).  Lynn LaFemina was not present at the meeting, and she did not provide testimony that she met with Ms. Olson immediately after the August 27, 2009 meeting.  Therefore, the Court finds that the statements of Lynn LaFemina do not constitute a present sense impression.

The Plaintiff also argues Ms. Olson's statements to Lynn LaFemina fall under the exception found in FED. R. EVID. 803(2) and (3).  Rule 803(2) provides that an exception to hearsay when "[a] statement relating to a startling event or condition [is] made while the declarant was under the stress of excitement caused by the event or condition." FED. R. CIV. P. 803(2).   Assuming that losing the position as TNR Coordinator was a "startling event or condition," the Plaintiff has failed to show that Ms. Olson remained "under the stress of excitement caused by the event or condition" the remainder of the day and into the evening hours when she related the meeting to Lynn LaFemina.  The element of trustworthiness of the statement is the reaction while under the stress when receiving the information, and the Plaintiff has failed to show that Ms. Olson's level of stress was constant for such a long period of time.  Further, a declarant's then exiting state of mind, must be a relevant issue to allow the evidence to be admissible.  *See, T. Harris Young & Associates, Inc. v. Marquette*

*Electronics, Inc.*, 931 F.2d 816, 827-28 (11th Cir. 1991).  The Plaintiff failed to show that Ms. Olson's state of mind is relevant.   Therefore, the Court finds that any testimony by Lynn LaFemina as to Ms. Olson's statements does not fall under the excited utterance exception to the hearsay rule.

The Plaintiff raises the argument that Ms. Olson's statements to Lynn LaFemina also fall under the then existing mental, emotional, or physical condition exception to the hearsay rule.  Pursuant to FED. R. CIV. P. 803(3), an exception to hearsay exists when  a  "statement [is made] of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."  As stated above, before admitting evidence regarding the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue.  *T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 827-28 (11th Cir. 1991).   In the instant case, the Plaintiff has failed to show that her state of mind is relevant to the issues in the case.  Therefore, the Court finds that Ms. Olson's statements to Lynn LaFemina are hearsay and not admissible for the purposes of summary judgment.

**B.  Discrimination Claims Under ADA, FCRA, and Rehabilitation Act (Counts I, V, and VI)**

In the Second Amended Complaint (Doc. 28) filed on August 31, 2010, the Plaintiff brings claims in Count I under the Florida Civil Right Act of 1992 ("FCRA"); in Count II for Intentional Infliction of Emotional Distress; in Count III for Negligent Supervision and Retention of Employee; in Count IV for violation of the Family and Medical Leave Act, 29 U.S.C. §2615 ("FMLA"); in Count

V under the Americans with Disabilities Act, 42 U.S.C. §12101 ("ADA"); and in Count VI under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").    The Defendants move for summary judgment on all of these claims.

### 1. Burden Shifting Framework

Plaintiff's claims brought under the ADA, Rehabilitation Act, and FCRA  are all analyzed under the same standard. *Kaw v. School District of Hillsborough County*, 2009 WL 248246 *5 (M.D. Fla. Jan. 30, 2009) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) ("'Discrimination claims under the Rehabilitation Act are governed by the same standards as used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa.'"), and *Greenberg v. BellSouth Telecomm., Inc.*, 498 F. 3d 1258, 1263-64 (11th Cir. 2007) (claims under the FCRA are analyzed in the same manner as ADA and Rehabilitation Act claims); and *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000).

In this case, the Plaintiff's evidence of discrimination is indirect, therefore, the Court will use the *McDonnell Douglas* burden-shifting framework.  The same burden-shifting framework used in Title VII found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is employed in ADA discrimination cases, and used for Rehabilitation Act and  FCRA claims as well.  *Palmer v. Albertson's LLC*, 418 Fed. App'x. 885, 887 (11th Cir. 2011).  To establish a prima facie case, a plaintiff must show: "(1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Id.*, *Cremeens v. City of Montgomery*, 427 Fed. App'x. 855, *1 (11th Cir. 2011).  "'Once a plaintiff establishes a prima facie case of discrimination, the defendant-employer must articulate a legitimate, non-discriminatory reason for the challenged

action.'" *Palmer*, 418 F. App'x. at 887 (citing *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11ᵗʰ Cir. 2001)).  If the employer shows a non-discriminatory reason or reasons, then the plaintiff must "'proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual.'" *Id.*, (citing *Wascura*, 257 F.3d at 1243)).  The plaintiff must meet each reason "head on" and "rebut it," and the plaintiff must rebut each and every reason proffered by the defendant.  *Id.*  To rebut a legitimate reason, the plaintiff cannot substitute her own business judgment or simply quarrel with the wisdom of the proffered reason.  *Id.* (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11ᵗʰ Cir. 2000) (*en banc*).  The ultimate burden of persuasion to show that the employer intentionally discriminated against the employee remains with the plaintiff. *Brooks v. County Com'n of Jefferson County, Ala.,*  446 F.3d 1160, 1162 (11ᵗʰ Cir. 2006).

## 2. Discrimination

The Defendants argue that there is no evidence of discrimination in this case, and no evidence of pretext.[10]  The Defendants assert that they have fully explained the reasons why Ms. Olson was removed from TNR Coordinator position.  The evidence presented shows that Hawthorne interacted with Ms. Olson almost every day while he was there and found Ms. Olson to be struggling as TNR Coordinator position.  Hawthorne did find that Ms. Olson's performance did improve over the 90 day probationary period, however, he continued to be concerned that she would not succeed.  At the end of the 90 day probationary period, Hawthorne met with Thigpen and discussed how Ms. Olson was struggling with the position.  Thigpen approved extending Ms. Olson's probationary period by 60

---

[10] The Defendants did not argue that the Plaintiff was not disabled nor that she was not a qualified individual.  Therefore, for the purposes of summary judgment, the Court will find that these elements are established.

days.  On June 29, 2009, Hawthorne met with Ms. Olson telling her that he was extending her probationary period by 60 days.  He also reviewed her performance.  The form did show that she had made satisfactory progress and met the requirements in the performance of her job description, however, Hawthorne also explicitly set forth Ms. Olson's deficiencies in her job performance.  He stated that he did not "sugar coat" these deficiencies and provided Ms. Olson with a list of 5 areas to improve.  Hawthorne stated in his comments on The Extension of Introductory Period form that Ms. Olson would need an additional 60 days to "solidify her performance."  Prior to his leaving, Hawthorne told Gipson that he regretting offering TNR Coordinator position to Ms. Olson because despite his help, he did not feel Ms. Olson  should was able to meet the job expectations.  When Bacon became the interim Director for TNR, she reviewed the areas that Hawthorne noted where Ms. Olson was deficient.  Bacon developed her own chart showing Ms. Olson's deficiencies.  Bacon met with Ms. Olson on most days, and on 3 occasions specifically regarding her Extension.  Bacon determined that Ms. Olson had not met the goals outlined in the Extension of Introductory Period form, and discussed these issues with Gipson and Thigpen.  At that point, Bacon decided to remove Ms. Olson as TNR Coordinator with Thigpen's approval.

The Plaintiff must rebut all of the legitimate reasons why Bacon found Ms. Olson deficient as TNR coordinator and show that the reasons were false, and that discrimination was the real reason. *See, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  The Plaintiff argues that the Defendants created a false sense of security by constantly reassuring Ms. Olson that she was doing fine.  Further, the Plaintiff cites to Ms. Olson's diary where she wrote that Gipson said, "To the contrary, because you have cancer we have been more lenient and let you get away with more because no one wanted to hurt [your] feelings."  Even assuming that Gipson made this statement which is

contested by Gipson, and even assuming that the Plaintiff is able to produce evidence that she was told she was doing "fine" and "not to worry," these statements alone do not show that each and every reason listed by Hawthorne and then Bacon as to the deficiencies of Ms. Olson were pretextual.  Ms. Olson was on probation for a 90-day period of time. Even though Hawthorne checked the box that Ms. Olson was making satisfactory progress, it was clear from his comments and his extension of the probationary period by 60 days, that Ms. Olson was not able to meet the requirements of TNR Coordinator  and needed additional time to be fully satisfactory in that position.  Further, Ms. Bacon stated that she met with Ms. Olson on 3 occasions to discuss the Extension.  The Plaintiff has failed to show that each reason for Ms. Olson's removal as TNR Coordinator was false and that discrimination was the real reason for her removal from that position.

The Plaintiff relies heavily on the case of *Vaughn v. Edel*, 918 F.2d 517 (5th Cir. 1990) for the proposition that when an employer fails to reprimand an employee for errors in her job performance, and this decision was racially motivated and eventually the employee is terminated, the employer's behavior is discriminatory.  In *Vaughn*, the employer gave no criticisms, feedback or suggestions for improvement to the plaintiff.  *Vaughn*, 918 F.2d at 519.  The Plaintiff's supervisor told another employee not to criticize the plaintiff's work, and wrote on evaluations that the plaintiff's work was "satisfactory."  *Id*.  While not criticizing the plaintiff, the employer did place a co-worker in a 90-day improvement program.  *Id*. at 522.  The plaintiff was eventually terminated.  *Id*. at 519.  In *Vaughn*, the court held that an employer may not withhold training from an employee and then discharge the employee because of poor performance.  *Id*.

The instant case is not similar.  There is no dispute that Ms. Olson was informed of her job deficiencies when she met with Hawthorne.  Further, rather than permanently approving Ms. Olson

as TNR Coordinator, Hawthorne extended the probationary period by 60 days.  This action notified Ms. Olson that she was not satisfactorily performing as TNR Coordinator.  Further, Bacon met with Ms. Olson on at least 3 occasions and discussed the Extension form with her.  Even if the Court admitted the hearsay evidence in Ms. Olson's diary or the hearsay testimony of Lynn LaFemina as to the state of mind of Ms. Olson that she was "flabbergasted" that she was removed from the position of TNR Coordinator, the factual evidence of the probationary period and the extension of the probationary period would not support Ms. Olson's state of mind.

The Plaintiff also cites to *Biggs v. State of Florida, Board of Regents*, 1998 WL 1069456 (N.D. Fla. Oct. 28, 1998) for the proposition that even though the Court in *Biggs* granted summary judgment to the defendant, the Defendants here have not shown that a jury would not be able to infer discrimination from their actions.  The Plaintiff argues that Ms. Olson's work history prior to her promotion to TNR Coordinator was exemplary.  There is no evidence to dispute this statement. However, there is evidence that Ms. Olson never held a managerial position prior to the TNR Coordinator position, and that she did not have the ability to handle this new and difficult managerial position.  The Plaintiff also argues that if one of Ms. Olson's deficiencies was her long absences from her desk, then the Defendants would not have allowed her to take a job as a unit secretary.  No evidence was presented as to the requirements of a unit secretary job, and having long absences from her desk was only one of Ms. Olson's deficiencies at the TNR Coordinator position.  The Court finds no merit in these arguments.  The Plaintiff has failed to present any evidence which shows that the actions of the Defendants were a pretext for discrimination.

### 3. Reasonable Accommodation

The Defendants argue that the Plaintiff claims that the Defendants terminated Ms. Olson without offering her a reasonable accommodation. The Defendants assert that Ms. Olson failed to request a reasonable accommodation. An employer discriminates against an employee if the employee is a qualified individual and the employer does not reasonably accommodate that individual's disability. *Anderson v. Embarq/Sprint*, 379 Fed. App's. 924, 927 (11ᵗʰ Cir. 2010). The duty to provide a reasonable accommodation "is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11ᵗʰ Cir. 1999)[11].

The Plaintiff argues that her FMLA documents which were approved by Ms. Olson's employers were her request for a reasonable accommodation. The Plaintiff argues that the paperwork showed that fatigue was a side effect of Ms. Olson's cancer, and Dr. Grossman indicated that Ms. Olson would experience periodic "episodic flare-ups." The Plaintiff then concludes that Ms. Olson would need additional break periods as a reasonable accommodation due to her handicap. However, there is no evidence that Ms. Olson specifically asked for additional breaks or for long absences from her desk, and there is no evidence that the Defendants denied any such requests. Further, the Defendants granted Ms. Olson's other requests for time off for medical reasons. Even if construed as a request for a reasonable accommodation, the FMLA documentation does not request additional breaks nor does it request additional time away from her work station. The reasonable accommodation must be specific and Ms. Olson failed to make a specific request for accommodation.

---

[11]  In *Gaston*, *supra*, the Court was discussing a reasonable accommodation under the Rehabilitation Act, however, the Court was citing to a case filed under the ADA, and therefore, the holding is applicable in this case.

### 4. Perceived as Having an Impairment

The Defendants asserts that there is no evidence that the Defendants regarded Ms. Olson as disabled. A plaintiff may establish a *prima facie* case of discrimination based on a perceived disability. *Cox v. City of Tampa*, 418 Fed. App'x. 845, 846 (11th Cir. 2011). "'[A] person is regarded as disabled within the meaning of the [Americans with Disabilities Act] if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities, [citation omitted] to the extent that the person is precluded from more that one type of job [citation omitted].'" *Id.* (internal quotation marks omitted). The mere fact that an employer is aware of an impairment is not sufficient to show that the employer regarded the employee as disabled or that the perception caused an adverse employment action. *Schwertfager v. City of Boynton Beach*, 42 F.Supp. 2d 1347, 1361 (S.D. Fla. 1999).

The Plaintiff argues that the unrequested leniencies given to Ms. Olson due to her cancer and the remark of Gipson that Ms. Olson was treated more leniently because she had cancer, show that she was perceived to be disabled. The Plaintiff has failed to provide any evidence that the Defendants believed that Ms. Olson was substantially limited in a major life activity which precluded her from more than one type of job. The record is clear that the Defendants and all the employees involved knew that Ms. Olson had cancer, but that recognition is not enough to show that the Defendants believed she was limited in a major life activity. Further, even though the Defendants removed Ms. Olson from her position as TNR Coordinator they helped her to find another job with the Hospital. The Defendants found that Ms. Olson was unable to meet the requirements of one job, TNR Coordinator but not all jobs at the Hospital. The Court finds that the Plaintiff has failed to show that the Defendants perceived Ms. Olson as disabled. Therefore, the Plaintiff has failed to establish a

claim for discrimination under the ADA, FCRA, or Rehabilitation Act and these claim must be dismissed

### C.  FLMA Claim (Count IV)

The Defendants argue that if the Plaintiff is attempting to assert an FMLA retaliation claim in Count IV, then that claim fails.  The Plaintiff asserts in her response that she is alleging both an FMLA retaliation claim and an interference claim.

### 1.  Retaliation

To establish an FMLA retaliation claim without direct evidence, the Court employs the same burden shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) as stated above.  To establish a *prima facie case,* the Plaintiff must show that (1) Ms. Olson engaged in a statutorily protected activity; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  *Daugherty v. Mikart, Inc.*, 205 Fed. App'x. 826, 827 (11th Cir. 2006) (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).  Close temporal proximity between the protected conduct and the adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact as to the causal connection, however this alone may not be sufficient to establish pretext.  *Id*. (quoting *Hurlbert*, 439 F.3d at 1298 (11th Cir. 2006)).

If the plaintiff established a *prima facie* case, then the burden shifts to the employer to set forth legitimate, non-retaliatory reasons for the adverse employment action.  *Id*. (citing *Hurlbert*, 439 F.3d at 1297 (11th Cir. 2006)).   If the employer sets forth a legitimate, non-retaliatory reason, then the

plaintiff must show that she will be able to demonstrate at trial that the employer's reasons for the action were pretextual. *Id.* (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

"Pretext is only proven if 'it is shown both that the reason was false, and that discrimination was the real reason behind the challenged action.'" *Id.* (quoting *St. Mary's Honor Center v.* Hicks, 509 U.S. 502, 515 (1993)). "'This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contractions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)).

Even assuming that the Plaintiff established the first two elements of a *prima facie* case, that Ms. Olson engaged in a statutorily protected activity, and  she experienced an adverse employment action, the Plaintiff has failed to show any evidence that there is a causal connection between the protected activity and the adverse action.  As the Plaintiff argues, there is no dispute that the Hospital was aware that Ms. Olson was approved for FMLA leave.  She was on FMLA leave when she was promoted to TNR Coordinator.  It is also undisputed that Ms. Olson was removed as TNR Coordinator while approved for  FMLA leave.  Ms. Olson was approved for FMLA leave on February 4, 2009, and the decision to remove Ms. Olson from her position as TNR Coordinator was made on August 27, 2009, which is not in close temporal proximity.  The Defendants have set forth legitimate non-retaliatory reasons for removing Ms. Olson as TNR Coordinator which were listed in Hawthorne's Extension form and Bacon's chart.  The burden has shifted to the Plaintiff to show that these reasons were pretextual.  The Plaintiff concludes that because the Defendants were aware of Ms. Olson being on FLMA leave, and she was terminated while on leave, there is a genuine issue of material fact as

to whether the Defendants retaliated against her.  However, the Plaintiff has failed to show that any of the stated reasons were false or that discrimination was the real reason behind the decision to remove her from her position.

## 2. Interference Claim

The Plaintiff alleges that she has established an FMLA interference claim. To establish an FMLA interference claim, the employee "need only show that his employer interfered with or denied him an FMLA benefit to which he is entitled. *Leach v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 2118723 *4 (11ᵗʰ Cir. May 27, 2011). The employer's motivations are immaterial. *Id.* (citing *Strickland v. Water Works & sewer Bd.,* 239 F.3d 1199, 1208 (11ᵗʰ Cir. 2001)). "However, if, the employee alleges that the employer denied the employee the right to reinstatement following FMLA leave, 'the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave.'" *Id.*, (quoting *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11ᵗʰ Cir. 2000)). If an employer can show that the reasons why an employee was not reinstated to a position was "wholly unrelated to FMLA leave" then an employer is not liable. *Id.*

The Plaintiff argues that Ms. Olson had the right under the FMLA to be restored to her position of employment held by her when the FMLA leave commenced, citing to 29 U.S.C. §2614(a)(1)(A) and 29 C.F.R. §825.214(a).  It is undisputed that Ms. Olson was approved for FMLA leave prior to being promoted to TNR Coordinator.  The Plaintiff asks the Court to treat this case as if Ms. Olson held the TNR position prior to the FMLA leave commencing.  The Court must accept the facts as supported by the declarations, depositions and documents in the case, and cannot change the facts to fit into the case law provided.  When Ms. Olson was approved for FMLA leave, she was an

-28-

Administrative Assistant in TNR.  She was promoted **after** being approved for FMLA leave.  The Plaintiff argues that Ms. Olson was promoted having no prior managerial experience suggesting that the Defendant promoted her knowing she would be unable to perform as TNR Coordinator.  While there is some evidence that Gipson was concerned about Ms. Olson's abilities, there is no evidence which supports the proposition that the Defendants promoted Ms. Olson so that she would fail.  The Plaintiff again concludes that because Ms. Olson was on FMLA leave at the time she was removed as TNR Coordinator, there is a genuine issue of material fact as to whether the Defendants interfered with her right to improve.   Hawthorne and Bacon gave Ms. Olson guidance and help as TNR Coordinator informing Ms. Olson of her deficiencies.  The Defendants gave Ms. Olson an additional 60 days to improve.   There is no evidence that Ms. Olson's removal as TNR Coordinator was due to her taking FMLA leave.  Her leave was always approved and she was able to go to all of her medical appointments as needed.  The only comment about her leave was that Bacon wanted notice of scheduled appointments so she could provide coverage, but never denied Ms. Olson FMLA leave.  Therefore, the Plaintiff has failed to establish  claims for retaliation or interference and these claims must be dismissed

### D.  Intentional Infliction of Emotional Distress (Count II)

The Defendants argue that the Plaintiff's intentional infliction of emotional distress is premised on Ms. Olson's removal as TNR Coordinator, and the Defendants' failure to provide an unidentified accommodation. The Defendants argue that even in the light most favorable to the Plaintiff, there is no support for the outrageous conduct that is required to sustain a claim for intentional infliction of emotional distress.  The Plaintiff argues that the Defendants' conduct was extreme and outrageous

when the Defendant removed Ms. Olson as TNR Coordinator because it "would increase her stress and possibly increase the effects of her breast cancer."  (Doc. 47, p. 18).

The elements of a claim for intentional infliction are "(1) deliberate or reckless infliction of metal suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe.  Additionally, the conduct must be so outrageous in character, and so extreme in degree, that it is considered atrocious [ ] and utterly intolerable in a civilized community." (internal quotation marks omitted),  *Thomas v. Hospital Bd. of Directors of Lee County*, 41 So.3d 246, 256 (Fla. 2d DCA 2010) (citing *Liberty Mutual Insurance Co. v. Steadman*, 968 So.2d 592, 594 (Fla. 2d DCA 2007) and quoting *Ponton v. Scarfone*, 468 So.2d 1009, 1011 (Fla. 2d DCA 1985)).

The Court will focus on whether the Defendants conduct was "outrageous."  The question of whether conduct amounts to "outrageous" is a question of law, not a question of fact.  *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2nDCA 2007).   If a person is peculiarly susceptible to emotional distress, and the other person knows it, then this second person's conduct may become heartless, flagrant, and outrageous, if the second person decides to proceed in the face of such knowledge. *Id.* (false statements made at funeral to grieving loved one requiring the decedent to have a second autopsy is sufficient outrageous conduct to meet the standard for intentional infliction of emotional distress).  However, the Court must view the conduct objectively to determine whether the conduct is "atrocious, and utterly intolerable in a civilized community." (internal quotation marks omitted),  *Liberty Mut. Ins. Co. v. Steadman*, 968 So.2d 592, 595 (Fla. 2d DCA 2007).  The subjective response by the person affected does not control.  *Matsumoto v. American Burial and Cremation Services, Inc.*, 949 So.2d 1054, 1056 (Fla. 2d DCA 2006).

-30-

The standard on a claim for intentional infliction of emotional distress is high in the employment realm and strongly disfavored. *Williams v. Davey Tree Expert Co.*, 2011 WL 4055601 *8 (M.D. Fla. Sept. 13, 2011) (citing *Martz v. Munroe Reg'l Med. Ctr., Inc.,* 2007 U.S. Dist. Lexis 49561, *6-7 (M.D. Fla. July 10, 2007)).   "Moreover, given the disfavored status of such claims in employment actions, Florida courts will not find the Defendant's conduct to be 'outrageous' unless such conduct involves persistent verbal abuse coupled with repeated offensive physical contact." *Id*. Here, the Plaintiff failed to allege any verbal or physical abuse, and certainly no persistent verbal or physical abuse. The only action that the Plaintiff alleges was done by the Defendants was the removal of Ms. Olson from her position as TNR Coordinator without telling her why, and even assuming that this is correct, this conduct does not constitute verbal or physical abuse, and does not rise to the level of "outrageous."   Therefore, the Plaintiff has failed to establish a claim for intentional infliction of emotional distress and this claim must be dismissed.


**E.   Negligent Supervision and Retention Claim (Count III)**

The Defendant argues that because the Plaintiff's claim for intentional infliction of emotional distress fails, the Plaintiff cannot bring a claim for negligence as a claim for negligence must be based on a common law tort.  Further, the Defendants assert that the Plaintiff's negligence claims must be dismissed under Florida's Impact Rule.  "'Negligent retention and supervision occurs when, during the course of employment, the employer becomes aware, or should have become aware, of problems with an employee that indicates his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment.'" *Pineda v. PRC, LLC*, 2011 WL 3022564 *2 (S.D. Fla July 22, 2011) (citing *Grice v. Air Prods. and Chem., Inc.*, 2000 WL 353010, at *15 (N.D. Fla. Feb. 17,

2011) (citing *Tallahassee Furniture Co. Inc. v. Harrison*, 583 So.2d 744, 753 (Fla. 1st DCA 1991)).

To allege negligent supervision or retention the underlying wrong must be a common law tort. *Id.*

(citation omitted). Even if the intentional infliction of emotional distress claim was viable, the

Plaintiff's negligent supervision and retention claim fails under the Florida Impact Rule.

Under Florida's Impact Rule, to recover damages for mental or emotional distress for a

negligence claim, the injury must flow from a physical injury or physical impact. *Freese v. Wuesthoff*

*Health System, Inc.*, 2006 WL 1382111 *9 (M.D. Fla. May 19, 2006), *Willis v. Gami Golden Glades,*

*LLC*, 967 So.2d 846, 850 (Fla. 2007). If the plaintiff has suffered a physical impact from an external

force, then the impact rule does not apply. However, if the plaintiff never suffered an impact, the

mental or emotional distress, must be manifested by physical injury, and the plaintiff must suffer this

physical injury within a short time of the incident. *Willis*, 967 So.2d at 850 (quoting *Eagle-Picher*

*Indus., Inc.,* 481 So.2d 517, 526 (Fla. 2d DCA 1985). In the instant case, the Plaintiff failed to allege

an impact. Further, the Plaintiff argues that "it may be reasonable to conclude that Ms. Olson's severe

emotional distress caused her breast cancer to worsen and might have even caused her death. The

worsening of Mrs. Olson's breast cancer may have caused further emotional distress which is not

barred by the impact rule." (Doc. 47, p. 19). The Plaintiff fails to cite to any evidence that the

Defendants' actions caused Ms. Olson's breast cancer to worsen or caused her death. Therefore, the

Plaintiff has failed to establish a claim for intentional infliction of emotional distress and this claim

must be dismissed

**IT IS HEREBY ORDERED:**

1)   The Defendants' Dispositive Motion for Summary Judgment (Doc. 41) is hereby

**GRANTED** as to Counts I, II, III, IV, V, and VI of the Second Amended Complaint (Doc. 28).

2) The Clerk is directed to enter Judgment in Defendants' favor, and thereafter, terminate all

pending motions and deadlines, and close this case.


**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this ___7th___ day of November,

2011.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE




Copies: All Parties of Record

-33-